UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

IN RE:                                          )
ANDREW S. MICKLER                               )        Case No.  04-35297
                                                )        Chapter 11
                    Debtor(s).                  )
                                                )
ANDREW S. MICKLER                               )
                    Plaintiff.                  )        A.P. No.  04-3284
vs.                                             )
TERRY J. MICKLER                                )
                    Defendant.                  )
_____                 )

## MEMORANDUM OPINION

This matter came before the Court for trial on March 8, 2005.  The parties each appeared in person and by counsel and the Court, having heard the testimony and evidence presented at trial, reviewed the authorities submitted by the parties and conducted its own research, enters judgment in favor of Defendant Terry J. Mickler (hereinafter "Terry") on the Complaint to Determine Dischargeability of Indebtedness filed by Plaintiff / Debtor Andrew S. Mickler (hereinafter "Andrew").  The Court enters the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Bank. P. 7052.

## FINDINGS OF FACT

1.      The parties were married on June 4, 1978.  The marriage lasted more than 22 years before Terry filed a Petition for Dissolution of Marriage on April 11, 2000 in Jefferson County Family Court.  There were two (2) children born of the marriage, Jason and David, both of whom were over the age of majority when the Petition for Dissolution was filed in 2000.

2.      The divorce proceedings were vigorously contested and tried before Judge Bowles of the Jefferson County Family Court on April 11, 2002.  On January 15, 2003, Judge Bowles

entered his Findings of Fact, Conclusions of Law and Order.  (Defendant's Exh 1).

3.     In addition to numerous other marital distributions,  Judge Bowles ordered that Andrew pay Terry an equalization payment in the amount of $109,061.50 as payment for her marital interest in the business known as Medical Practice of Andrew S. Mickler, M.D.  He also ordered the marital residence located at 7606 Deer Meadow Drive, Louisville, Kentucky (the "Residence") sold with the proceeds from the sale to be split equally.  The parties marital property also included approximately $824,458.91 in retirement accounts (SEP and IRA).  Judge Bowles ordered these funds divided equally between Terry and Andrew.  With regard to maintenance, Andrew was order to pay Terry $7,000.00 per month for a period of one hundred forty-four (144) months effective September 1, 2001.   In support of this maintenance award, Judge Bowles found that Terry did not have a job and had not been gainfully employed outside the home for over twenty (20) years.  Judge Bowles also ordered Andrew to pay Terry's attorney fees of approximately $21,841.75.  (Defendant's Exh. 1).

4.     Andrew filed a Motion to Alter, Amend and Vacate the Order (Defendant's Exh. 2), and the Family Court entered an Order on the Motion on April 3, 2003 (Defendant's Exh. 5), making the judgment final.  On April 14, 2003, Andrew filed his Notice of Appeal seeking appellate review of the Family Court Orders entered January 15, 2003 and April 3, 2003.  (Defendant's Exh 6).  Andrew did not post a supersedeas bond as is required to stay enforcement of the orders.

5.     On May 7, 2003, Terry moved in Family Court for a finding of contempt against Andrew for his alleged failure to comply with the previous orders.  A hearing on the motion for contempt was scheduled for August 13, 2003.  (Defendant's Exh. 7 and 9).

2

6.      On August 11, 2003, two days before the contempt hearing, Andrew filed a voluntary petition for relief pursuant to Chapter 13 of Title 11, Case No. 03-35473. (Defendant's Exh. 17).

7.      On October 20, 2003, Terry moved to dismiss the bankruptcy petition.  After several continuances, the hearing on the motion to dismiss was held on January 28, 2004.  Prior to the hearing, the parties reached an agreement that the bankruptcy would be voluntarily dismissed subject to, among other things, Andrew paying a reduced maintenance payment pending the decision of the Kentucky Court of Appeals.  (Defendant's Exh. 22).  An order dismissing the Chapter 13 bankruptcy case was entered January 28, 2004. (Defendant's Exh. 20).

8.      On April 2, 2004, the Kentucky Court of Civil Appeals affirmed the Jefferson Family Court's findings and conclusions with one exception.  The Court of Appeals held the trial court abused its discretion in failing to specifically designate the maintenance award could be modified pursuant to KRS 403.250(1) upon a showing of substantial and continuing change of circumstances.  In all other respects, the decision of Judge Bowles was affirmed. (Defendant's Exh. 23).  As of this trial, Andrew has not moved for a modification.

9.      Terry filed a second motion for contempt which Judge Bowles set for hearing on August 19, 2004.

10.      On August, 18, 2004, the day before the scheduled contempt hearing, Andrew filed the instant petition under Chapter 11.[1]

_____

[1] Terry has moved to dismiss the bankruptcy case, which was heard and argued at the same time as this dischargeability adversary.  A decision on the motion to dismiss is forthcoming.

3

11.   Andrew initiated this dischargeability adversary proceeding on August 24, 2004, alleging the portions of the family court order constituting maintenance are unreasonable in light of his financial circumstances.   With respect to the portions of the family court order constituting a property settlement, Andrew asserts he does not have the ability to pay such indebtedness and that the benefit of a discharge of such debt would outweigh the detrimental consequences to Terry.

12.   Terry answered on September 23, 2004, denying the allegations contained in the complaint.

13.   Trial on this adversary was held on March 8, 2005.

14.   Andrew testified he is 54 years old and has been employed as a physician since 1982.  He admitted that he has not paid Terry her interest in the medical practice and that he has not made regular maintenance payments in the amount determined by Judge Bowles.  Andrew was uncertain of the exact amount of arrearage on his maintenance obligations. Additionally, while some portion of Terry's attorney's fees and costs were paid, Andrew was uncertain as to the exact amount.

15.   From 2000 to 2004, Andrew's total gross income was approximately $2,481,903. (Plaintiff's Exh. 16).  Andrew's monthly income ranges from $41,193.55 as reported on Schedule I filed with his 2003 Chapter 13 bankruptcy petition to $43,461.03 as indicated in Andrew's "System Financial Summary" for 2003. (Defendant's Exh. 11 and 47).  On his Schedule I filed with his current Chapter 11 case, Andrew asserts his 2004 monthly income is only  $35,282.37. (Defendant's Exh. 36).  This amount is in conflict with the $37,861.05 amount reported for the 2004 figures on his "System Financial Summary." (Defendant's Exh. 47).  In both situations, it appears Andrew understated his income on his bankruptcy

4

schedules.

16.    Andrew testified that his gross income has decreased from 2000 to 2004 and that based upon the first two months of the year, he also expected his 2005 income to be lower than his 2004 income.

17.    Andrew testified that he had heart bypass surgery in May, 2002. Andrew's corresponding decrease in gross income is reflected in his summary of income from 2000-2004. (Plaintiff's Exh. 16) That same exhibit demonstrates Andrew has recovered completely from this procedure at least as far as earnings go. There are numerous examples where he earned as much or more monthly gross income after the heart surgery as he had prior to the surgery.

18.    Even with a supposed decrease in income, he testified he was still able to give funds to charity, which he defined as constituting temple fees and contributions to the University of Louisville. The contributions to the University of Louisville were made in order to purchase 2 sets of tickets to the University of Louisville basketball and football games.

19.    He also testified that he pays for his adult son's college tuition, car, and car insurance. With respect to the tuition, he expects his son to graduate this year.

20.    Andrew's total outstanding debt is approximately $60,903.03. (Plaintiff's Exh. 11). Of this amount, approximately $9,778.10 represents amounts owed to his divorce attorney, $6,905.20 represents amounts owed to his bankruptcy counsel, $2,015.23 represents auto insurance for Andrew and his son, $9,533.53 represents credit card debt owed to Citibank, $1,296.95 from purchasing a hearing aid for a patient, $2,000 is designated to Reassure America for life insurance, and $6,058.87 represents amounts owed for his son's tuition at the Indiana University. With these exceptions, the bills represented on this exhibit are, for

5

the most part, ordinary course of business expenses.

21. Andrew testified that prior to the bankruptcy and divorce he had a line of credit with PNC Bank secured by his Residence. He was the sole signatory on this line of credit. On March 17, 2000, less than a month prior to Terry instituting the divorce proceedings in family court, Andrew took a $19,500 check advance upon this account. (Defendant's Exh. 48) This is one of many large financial transactions Andrew made on the eve of judicial actions.

22. On April 10, 2002, the day before the divorce trial began, Andrew drew down $25,010 on this line of credit. (Defendant's Exh. 48) This draw down resulted in a direct reduction of the equity in the Residence that Terry and Andrew were later ordered to divide equally. Although Andrew proffered an excuse that this advance was made for tax purposes, nothing was presented to support this claim. Indeed, the timing of the withdrawal indicates a deliberate attempt by Andrew to shield assets from Terry.

23. Furthermore, the history of this account showed that Andrew made regular principal payments on this line of credit, even after the filing of the divorce proceeding. After the $25,010 advance on the day before the divorce trial began, however, Andrew stopped making principal payments.

24. At the time the Residence was sold, over $96,100 was owed on the line of credit. No explanation was provided to this Court with respect to the other $71,000, or if Terry enjoyed the benefits of these additional funds. After the sale of the property, there was just over $500 in equity to divide between the parties.

25. Notwithstanding the fact that Andrew is a resident of Louisville, Kentucky, Andrew maintained a bank account at First Harrison Bank in Corydon Indiana. As mentioned above,

6

Andrew filed a previous Chapter 13 case. Terry filed a motion to dismiss that petition which was set for hearing on January 28, 2004. On January 8, 2004, twenty days before the scheduled hearing, Andrew withdrew $515 from the bank account at First Harrison. On January 27, 2004, the day before the dismissal hearing, Andrew withdrew another $44,888 from this account. The next day, the day of the hearing, Andrew withdrew another $20,000. With these withdrawals, Andrew reduced his bank account balance to just over $400 on the day of the hearing. (Defendant's Exh. 42). No credible explanation was given for these withdrawals. Again, the timing of these withdrawals indicate a deliberate attempt to shield these funds from Terry. Andrew testified that after his bankruptcy was dismissed, he re-deposited the money and evidently used it pay other creditors.

26.   Evidence was presented regarding Andrew's credit card transactions. With respect to purchases, evidence was presented that Andrew is able to spend anywhere from $80 to $159 a month on comic books. For the year 2003, Andrew spent over $1,250 on comic books. Payments for basketball and football tickets during this same time exceed $5,000. (Defendant's Exh. 53). These purchases evidence an ability of Andrew to make discretionary purchases when it suits his purposes. These discretionary purchases continued even after Andrew filed for bankruptcy protection.

27.   As for credit card payments, prior to the filing of this Chapter 11 bankruptcy petition, Andrew historically paid all monthly credit card debts in full, usually before their due date. Even when the balance exceeded $5,000, Andrew still paid the entire amount due. This practice continued even after the filing of the bankruptcy petitions. (Defendant's Exh. 53).

28.   On the July 5 - August 4, 2003 statement, the balance owed was only $2,234.76. Yet on

7

August 14, 2003, three days after Andrew filed his Chapter 13 bankruptcy petition, Andrew paid $10,000 on his credit card. The check for this payment is dated August 9, 2003, just two days prior to the filing of the Chapter 13 bankruptcy petition. No explanation was given for this overpayment. Additionally, on the July 5, 2004 - August 4, 2004 statement, the month before the instant bankruptcy petition was filed, Andrew again paid more than the amount due. The timing and manner of these payments, including overpayments, indicates to the Court that Andrew was attempting to shield or hide assets from Terry and his other creditors. (Defendant's Exh. 53).

29.     Andrew represented that his yearly expenses included approximately $31,487.81 for college tuition for his adult son to attend Indiana University. He acknowledged that this was a voluntary expense not required by law or court order. He was unable to verify this total amount was actually paid with any documentary evidence. Indeed, the credit card transactions reflect that only some $14,266 was spent on tuition to Indiana University. (Defendant's Exh. 53).

30.     Andrew also testified that in 2004, he voluntarily supported his adult son by giving him a $1,400 monthly wire transfer. This amount is an increase from the monthly $1,100 he had previously been paying his son on a monthly basis.

31.     The parties vigorously disputed the amount of the increase in the cost of malpractice insurance Andrew has to pay. Andrew testified that his malpractice premiums increased dramatically from 2003 to 2004. He contended the malpractice insurance increased from approximately $17,896.12 to $24,242.80. This higher amount is the one reflected on Andrew's exhibit of monthly expenses. (Plaintiff's Exh. 1 and 16). This figure is in conflict

8

with the documents Andrew submitted to Terry during discovery which reflect the malpractice insurance as only $20,013, consisting of $18,660 for premiums and a finance charge of $1,353. (Defendant's Exh. 46 and 55). From the evidence presented, the Court concludes that Andrew paid the down payment for 2004 coverage and the down payment for 2005 coverage during 2004, which artificially inflated the true annual medical malpractice insurance expense.

32. Evidence was presented that Andrew pays for life insurance for his two adult children, even though he is under no legal obligation to do so.

33. There were numerous discrepancies between Andrew's Schedule J expenses filed with his Chapter 11 case and his list of expenses filed in connection with this adversary proceeding. (Defendant's Exh 36 and Plaintiff's Exh. 1) Both exhibits include items which Andrew has no legal obligation to pay (son's auto, college tuition, and charity). Although Andrew resisted the characterization that he had "padded" his business and personal expenses, the evidence leads the Court to the opposite conclusion. To illustrate, Andrew asserted his 2004 taxes will be significantly higher than his 2003 taxes even though he previously testified that his 2004 income is significantly less than his 2003 income. The Court will not address each of the other specific expenses, but will instead state that the record is replete with expenses that appear to be voluntary, inflated, and excessive.

34. Terry is 55 years old and has not been gainfully employed for over twenty (20) years. At the beginning of the marriage, in 1978, Terry's education and experience enabled her to work in the field of radiology as an x-ray technician. Her employment in this field ceased after her marriage to Andrew. While she does have some basic clerical skills and basic film

9

making skills, she does not have the present ability to adequately support herself.  She has no current income.

35.    Terry suffers from numerous physical and mental ailments, which require professional treatment and various medications.  Due to her poor financial condition, she has not been able to afford either the appropriate treatment or the prescribed medications on a regular basis.  Terry has no health insurance.

36.    Even though Terry is active on social and political issues, no evidence was presented from which this Court could conclude that these activities could turn into meaningful gainful employment.

37.    Terry's expense budget reflects numerous items she needs and can no longer afford. Examples of this include massages for a degenerative disc syndrome and medications to address symptoms of a brain injury she suffered as a result of a hysterectomy.  Additionally, the budget is very modest with few, if any, luxury items.  (Plaintiff's Exh. 55).

38.    Helen Cohen, CPA, testified as an expert witness on behalf of Andrew.  She testified of an overall downturn in the market for the type of medical services provided by Andrew.  She predicted that Andrew's income would continue to decrease while his expenses would continue to increase.

39.    On cross examination, Ms. Cohen admitted she had only recently been contacted about this case.  She further admitted that her conclusions were based primarily upon the information provided to her by Andrew.

40.    Exhibit 1 to her expert report broke down Andrew's income and expenses from the year 2000 through the year 2004.  (Plaintiff's Exh. 16).  As stated earlier, one of the biggest

increases in expenses on the report is the increase in malpractice insurance.  And as stated earlier, this figure is not reflective of Andrew's actual cost, but more reflective of what he voluntarily paid.

41.    Exhibit 1 also reflected a significant increase in benefits Andrew pays for his employees in 2004 from previous years.  (Plaintiff's Exh. 16). These increases were voluntarily made.

42.    Exhibit 1 also  showed a dramatic decline in gross charges in direct correlation to Andrew's legal proceedings. (Plaintiff's Exh. 16)

## CONCLUSIONS OF LAW

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and venue is proper under 28 U.S.C. § 1409(a).  The parties have submitted to the jurisdiction of this Court.

 Under the Bankruptcy Code the discharge of debt arising from the dissolution of a marriage is governed by two distinct Code sections, 11 U.S.C. § 523(a)(5) and 11 U.S.C. § 523(a)(15). Section 523(a)(5) of the Bankruptcy Code states in relevant part that "[a] discharge under 727 ... does not discharge an individual from any debt ... to a spouse for alimony to, maintenance for, or support of such spouse." Section 523(a)(15) excepts from discharge marital obligations that are more in the nature of property settlements and not alimony, maintenance, or support obligations covered under § 523(a)(5).

Nondischargeability under § 523(a)(15) is subject to two exceptions, the existence of either one allows the debtor a discharge of that property settlement obligation.  Subsection (A) provides that the obligation is discharged if the debtor: does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support

11

of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business. 11 U.S.C. § 523(a)(15)(A). Subsection (B) provides that the obligation is discharged if "discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor." 11 U.S.C. § 523(a)(15)(B).

While these statutes seem relatively straight forward on their face, a great deal of case law has been developed to explain their operation. As there is no question that Terry is Andrew's former spouse or that the obligations at issue here were incurred in connection with the divorce proceeding, our analysis of the application of these statutes begins first with a determination of whether the obligations in question are in the nature of alimony, maintenance or support. For purposes of this decision, the Court will group the obligations at issue into three separate groups: (1) the obligation to pay maintenance of $7,000 per month for 144 months, (2) the obligation to pay one-half of Terry's attorney fees, and (3) the marital property distribution (which includes the obligation to pay Terry for her marital interest in Andrew's medical practice).

The Sixth Circuit Court of Appeals issued several decisions explaining the analysis to be undertaken under § 523(a)(5) to determine if obligations are in the nature of alimony, maintenance, or support. Our discussion begins with the Sixth Circuit decision of Long v. Calhoun (In re Calhoun), 715 F.2d 1103 (6th Cir.1983). In Calhoun, the court had to determine whether an assumption of debt, labeled as alimony but located in the "Division of Property" section of the separation agreement, was actually in the nature of support. To make this determination, the Sixth Circuit created a four-part analysis focusing on (1) whether the parties intended to create an obligation to be in the nature of support, (2) whether the obligation in fact provides support, (3)

12

whether the support award is unreasonable; and (4) if unreasonable, the amount of the debt to be discharged to carry out the policy of the bankruptcy code.  Id. at 1109 -10.  The Calhoun test was to be applied "when obligations are 'actually in the nature of alimony, maintenance, or support,' and thus nondischargeable, even though they may not be designated as such."  Fitzgerald v. Fitzgerald (In re Fitzgerald), 9 F.3d 517, 520 (6th Cir. 1993).

Several years later, the Circuit again delved into these issues in Fitzgerald v. Fitzgerald  (In re Fitzgerald), 9 F.3d 517 (6th Cir.1993).  In Fitzgerald, the Circuit regretted that Calhoun "has been applied more broadly than intended," and acknowledged that a majority of other courts had rejected the second prong or "present needs" test of the Calhoun analysis when applied to alimony or support.  Unlike Calhoun where it was necessary to determine whether something not denominated as support was really support, Fitzgerald addressed the issue of whether something denominated as support should be treated as support, and not a property settlement in disguise. The Circuit concluded that a state court's award of alimony is entitled to deference when labeled and structured as such. "Here, where no one disputes that these payments are anything except alimony payments, Congress has directed that they are not dischargeable."  Thus, if the state court clearly delineates an award as alimony, maintenance, or support, the Calhoun four part test does not apply because the intent of the state court is apparent from the face of judgment.

Despite Fitzgerald's relatively clear directive, the Sixth Circuit again studied the point when it issued Sorah v. Sorah (In re Sorah), 163 F.3d 397 (6th Cir. 1998).  Sorah advised bankruptcy courts faced with a question whether an obligation is in the nature of support to review the obligation in light of "traditional indicia" of a support award, including (1) a label such as alimony, support, or maintenance in the decree or agreement, (2) a direct payment to the former spouse, as opposed to

the assumption of third-party debt, and (3) payments that are contingent upon such events as death, remarriage, or eligibility for Social Security benefits. Id. at 401 (6th Cir.1998). Sorah involved an award labeled "maintenance." Even with this delineation, the bankruptcy court engaged in an independent inquiry and determined the award was not really in the nature of support and, as such, was a dischargeable debt. Sorah reversed the lower court rulings and reaffirmed the requirement that bankruptcy courts should defer to state courts' decisions if awards appear to be in the nature of support. In other words, if an obligation has the indicia of support and is delineated as such, the there is a conclusive presumption that the award is support and bankruptcy courts are not to challenge that presumption by inquiry into the award.

Sorah did not stop at this point. Instead, the Sixth Circuit went on to hold that after the nature of the obligation is determined as support, the "burden then shifts to the debtor spouse to demonstrate that although the obligation is of the *type* that may not be discharged in bankruptcy, its *amount* is unreasonable in light of the debtor spouse's financial circumstances." Sorah at 401 (emphasis in original). This was the third prong of the Calhoun test. Even though an award was conclusively presumed to be in the nature of alimony, maintenance or support, to the extent that the support award exceeded what the debtor could reasonably pay, Sorah concluded the debt could still be discharged. Id. at 402.

The Court will first address the obligation to pay $7,000 a month for 144 months which the state court labeled as maintenance. With respect to these payments, the parties stipulated that these payments do indeed constitute maintenance. As such, the Court need not perform the Calhoun analysis, but must still apply the Sorah analysis and determine to what extent, if any, this amount exceeds the debtor's reasonable ability to pay.

14

Initially, the Court finds that the amount and duration of the maintenance award was appropriate and reasonable considering the state court's findings of fact with regard to the parties' assets, debts, and resources.  Furthermore, based upon the evidence presented in this case, it is clear to this Court that Andrew has the means and ability to repay this amount in full.  Sufficient evidence was presented that any shortcomings on the part of Andrew to repay these debts result from a conscious choice by him to be without funds.  Andrew voluntarily chose to allocate funds to his adult children.  He chose to allocate funds on comic books.  He chose to pay bills before they were due.  He chose to pay for automobile and life insurance on his adult children and increase benefits to his staff when he was under no legal obligation to do so.  The record is replete with instances of Andrew deliberately choosing to pay himself and others instead of Terry.

Furthermore, with respect to Andrew's evidence of a decline in income from his medical practice, this Court cannot find as a matter of law that his current financial circumstances prevent him from paying this obligation.  Should Andrew's income from his medical practice continue to decline as he predicts, he is free to seek modification of the maintenance award as held by the Kentucky Court of Appeals.  However, it is this Court's belief that such grim financial circumstances will not be present in the foreseeable future.  As for now, the amount Andrew was ordered to pay does not exceed the amount he can reasonably be expected to pay.  This maintenance obligation is, therefore, non-dischargeable under § 523(a)(5).

Turning to the attorney fees, as stated above, the state court did not delineate this obligation as alimony, maintenance, or support.  Judge Bowles based his decision to award Terry one-half of her attorney fees upon the earnings capacity of both Andrew and Terry, the division of the marital assets, and the maintenance award.  Historically, the award of attorney fees in a divorce judgment

15

has been found to be in the nature of support in bankruptcy proceedings.  See Pauley v. Spong (In re Spong), 661 F.2d 6 (2d Cir. 1981); In re Smither, 194 B.R. 102 (Bankr. W.D. Ky. 1996);  Hodges v. Martin J. Holmes & Assoc. (In re Hodges), 139 B.R. 846 (Bankr. N.D. Ohio 1991).  Considering the disparate financial circumstances between Andrew and Terry, this Court concludes that the obligation to pay one-half of Terry's attorney's fees and costs was clearly intended as a support obligation.

Applying the "reasonable ability to repay" test from Sorah to this obligation, this Court concludes, for the same reasons stated above with respect to the maintenance payments, that the amount of attorney's fees and costs Andrew was ordered to pay does not exceed his reasonable ability to repay.  Thus, this obligation is not dischargeable to any extent under § 523(a)(5).

The Court turns now to the remaining obligations.  As with the award of attorney's fees and costs, the state court did not delineate these obligations as alimony, maintenance, or support.  Nor do the obligations contain any of the "traditional indicia" of a support award.  The Court concludes that because these obligations do not bear the traditional indicia of support and there is no manifest intent to create a support award, they are not in the nature of alimony, maintenance, or support.  These obligations merely represent a division of property and as such do not fall under the provisions of § 523(a)(5).

Consequently, the Court must turn to the provisions of § 523(a)(15) to determine their dischargeability.  Generally speaking, if a debt does not qualify for treatment under 523(a)(5), but is incurred by the debtor in the course of a divorce proceeding, it is dischargeable unless either the debtor does not have the ability to repay such debt or discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to his former spouse.  11 U.S.C. §

16

523(a)(15)(A) and (B).  Subsection (A) is referred to as the ability to pay test, while subsection (B) is commonly known as the balancing test.  The burden is upon the debtor to demonstrate, by a preponderance of the evidence, that he meets either of the exceptions presented in § 523(a)(15).  In re Jenkins, 202 B.R. 102 (Bankr. C.D. Ill. 1996).

Under the ability to pay test, the Court must focus on the income and expenses of Andrew. See also Koenig v. Koenig (In re Koenig), 265 B.R. 772 (Bankr. N.D. Ohio 2001).  The ability to pay test does not require the Court to determine whether the debtor can repay the whole obligation in one lump sum.  Rather, the Court must determine if the debtor has the ability to repay the debts in installments over time from future income.  In re Taylor, 191 B.R. 760, 767 (Bankr. N.D. Ill. 1996).  Andrew testified he does not have the ability to pay these debts.

At this time, the Court will comment upon the credibility of Andrew's testimony concerning his lack of financial resources.  The Court finds that in many instances Andrew failed to candidly respond to the questions presented to him by Terry's counsel.  His testimony was at times inconsistent, evasive, and less than honest.  The demeanor of Andrew, as witnessed by the Court during the trial, did much to undermine the Court's confidence in both the care and the truthfulness he brought to the witness stand.  His inconsistencies, semantic word play, and selective memory clearly evidenced an intent, if not to mislead, then to conceal.  A person cannot engage in selective amnesia when questioned by opposing counsel and have perfect recollection when questioned by his own counsel and maintain a high level of credibility.

A review of the credible evidence presented in this case leads this Court to conclude Andrew has the ability to pay these debts.  Andrew has a significant income stream from his medical practice.  Andrew's gross income was approximately $412,405.19 in 2004.  This figure is the lowest

17

Andrew has made in the five preceding years.  It is entirely possible Andrew's income could rise back to the levels he was earning just a few years ago.  While Andrew does have a large number of expenses, were the Court to remove the extravagant expenses (basketball tickets, comic books), the expenses paid voluntarily (son's car, son's life and auto insurance, son's college tuition), or the expenses paid in advance (portion of malpractice insurance, credit cards), more than sufficient income would remain to repay this debt.  With reasonable budgeting and a more conservative attitude toward gifts and expenses, the Court is convinced that Andrew has the ability to repay these debts over a reasonable period of time.  The Court will also repeat what it held earlier.  Should Andrew's medical practice income continue to decline as he predicts, he is always able to seek a modification in state court of the maintenance award.

Turning to the balancing test, there is absolutely no question here that discharging these debts would not result in a benefit to Andrew that outweighs the detrimental consequences to Terry.  Terry has no income and her expenses are *de minimis* in comparison with Andrew's.  Terry is, and has been, completely dependent upon Andrew for support for the last 22 years.  While she may have some limited clerical skills, the fact that she has not been in the workforce for over twenty years is very telling on the issue of her earning capacity.  For all practical purposes, she could hope for little more than a minimal wage based upon her recent work experience and qualifications.  Additionally, unlike Andrew, Terry has untreated medical conditions that would hinder her from gaining meaningful employment.

Andrew makes the argument that Terry is underemployed or voluntarily unemployed and that this fact should carry great weight in the balancing test.  The Court rejects this characterization *in toto*.  Terry is not underemployed as Andrew suggests.  Even if she at one time worked in

18

radiology, she has not worked in this field in over 20 years.  To assert she could go out in the work force and take up where she left off 20 years ago defies reason.  Furthermore, the fact that Terry does not hold a meaningful job was not the result of some spur of the moment, pre-bankruptcy planning to trick the Court into excepting these debts from discharge.  During the course of the 22 year marriage, the parties decided that Terry would not work outside the home.  To now complain that Terry should be penalized for this joint decision flies in the face of all reason.  While underemployment or voluntary unemployment certainly may be considered in certain circumstances, they simply are not present in this case.  Because Andrew has failed to meet his burden of proof under both the ability to pay test and the balancing test, these debts are non-dischargeable under § 523(a)(15).

For the reasons set forth above, a judgment in favor of the defendant will be entered this same date.

UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| ANDREW S. MICKLER | ) | Case No.  04-35297 |
| | ) | Chapter 11 |
| Debtor(s). | ) | |
| | ) | |
| ANDREW S. MICKLER | ) | A.P. No.  04-3284 |
| Plaintiff. | ) | |
| vs. | ) | |
| TERRY J. MICKLER | ) | |
| Defendant. | ) | |
| _____ | ) | |

**JUDGMENT**

Pursuant to the Court's Memorandum entered this date and incorporated herein by reference, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that the debts arising from the dissolution of the parties marriage are declared non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(5) and 523(a)(15).  It is further

**ORDERED** that, pursuant to 11 U.S.C. § 349(a),  the debts arising from the dissolution of the parties marriage may not be discharged in any future bankruptcy case filed by the Debtor.

This is a final and appealable order and there is no just reason for delay.